# 𝔖taunton

MARY LUCK STEGAL AND R. H. MOSS V. UNION BANK AND
FEDERAL TRUST COMPANY.

September 20, 1934.

Present on Original Argument, Campbell, C. J., and Epes, Hudgins,
Browning and Chinn, JJ.

The opinion states the case.

*George E. Allen* and *F. C. Bedinger,* for the plaintiffs in error.

*Christian & Barton* and *Sterling Hutcheson,* for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action brought by Union Bank and Federal Trust Company against Mary Luck Stegal and R. H. Moss to recover from them $900 with interest from October 30, 1930, until paid, and "ten percent thereof as attorney's fees," which it claims to be due to it according to the tenor of the below described negotiable note, which it alleges was "negotiated to it as a holder for value and in due course of business" by the Planters Bank of Clarksville, Virginia.

So far as it is here material the note sued upon reads as follows:

"$900 Clarksville, Va., Oct. 30, 1929.

"On demand days after date I promise to pay to the order of Planters Bank Nine Hundred ———— Dollars, negotiable and payable at the Planters Bank, Clarksville, Virginia, for the loan of money; and we, the makers and endorsers of this note, severally waive the benefit of our homestead exemptions as to this debt and agree to pay the holder hereof an attorney's fee of ten per centum of the amount due hereon in case the same be not paid at maturity; * * * and the maker and endorser, each hereby waives demand protest and notice of non-payment hereof.

"P. O. ..........................

"(Signed) MARY LUCKE STEGAL."

The note has the following endorsation and memorandum written on the back of it:

"R. H. Moss
"Int. Paid to June 30-1930 36.00
"Planters Bank Clarksville, Va. by C. S. Wood, Prest."

The defendants pleaded *nil debet,* and in accordance with the order of the court filed their grounds of defenses, which state that "the defendant will rely on all the defenses that can be properly raised under the plea of the general issue in this case," and also sets forth, but with less particularity, the same defenses which were set up in their special pleas. They also filed four special pleas of set-off.

Special plea No. 4 alleges that the note sued on was negotiated by the Planters Bank to the plaintiff an unreasonable length of time after its issue; that, therefore, the plaintiff is not a holder thereof in due course; that when the note was negotiated to the plaintiff and when the Planters Bank suspended payment and was placed in the hands of a receiver, on December 12, 1930, there was on deposit in the Planters Bank to the individual credit of Mary Luck Stegal $115.95, for which sum the bank was, and still is, indebted to her; and that she is entitled to and offers to set-off this sum against the sum remaining due and payable on the note sued upon.

Special plea No. 1 reads as follows: "These defendants, by their attorneys, come and say, that at and before the making and delivery of the note sued on in the notice of motion for judgment in this action, these defendants were administrators of the estate of the late .......... Stegal, deceased; that these defendants had on deposit in the Planters Bank of Clarksville, the plaintiff's transferer, a sum of money approximating the amount of $5,000, as administrators of the estate of the said .......... Stegal, deceased; that the estate consisted of a much larger sum, and the commissions allowed by law to these defendants, as administrators of said estate, amounted to the sum of $2,-821.77; that upon the date of the execution and delivery of

the said note, the said commissions had accrued to these defendants, and $2,821.77 of the said $5,000 actually belonged to these defendants; *that the said note sued on was executed by these defendants and delivered to the said Planters Bank of Clarksville upon the condition that the same should not leave the Planters Bank of Clarksville or be in any way pledged or hypothecated or otherwise transferred to any third party; and that the same would be kept in the files of the Planters Bank of Clarksville so that these defendants might, at any moment they desired, withdraw their said commissions and pay off the said note; that in consideration that these defendants would execute and deliver said note to the Planters Bank of Clarksville, the said bank agreed to the said conditions, annexed to said note upon the delivery thereof, and received the notes upon the express condition that the same would not be removed from the files of the Planters Bank of Clarksville, but would at all times remain in said files so that it might be paid at any moment by a withdrawal from the said account of the commissions aforesaid to which these defendants were entitled;* that subsequently, these defendants withdrew one-half of the said commissions, to-wit: The sum of $1,410.88, but left the residue of the said sum of $2,821.77 to the credit of these defendants, as aforesaid, for the express purpose of paying the said notes here sued on, and another note of these defendants for the sum of $500, delivered to the Planters Bank of Clarksville at the same time of the delivery of the said $900 note, *and delivered upon the same conditions that the said $900 note was delivered upon; and these defendants say, that they, confiding in the said promise and undertaking of the said Planters Bank of Clarksville, did afterwards, to-wit, on the day, month and year last aforesaid, execute and deliver to the said Planters Bank of Clarksville the said note whereon this action is founded, for the sum of $900, and there was no other cause, inducement or consideration whatsoever for the making and delivery of said note. And these said defendants further say that the Planters Bank of Clarksville did not perform, ful-*

*fill or regard its said promise and undertaking, but wholly failed and made default in this*, that the said Planters Bank of Clarksville after keeping the said note in its files *in accordance with the said promise and undertaking, and in accordance with the said condition upon which the same delivered,* for about a year, *in flagrant violation of its said promises and undertakings,* undertook to transfer and deliver said note long after the same had become past due, to the plaintiff herein, the Union Bank and Federal Trust Company, while there was still on deposit the said sum of $1,410.88, being the commissions aforesaid belonging to these defendants, which had been kept on deposit aforesaid, *in accordance with the agreement of the parties,* for the sole purpose of meeting and paying off said note, together with said other note of $500.

"And these defendants further say that the said plaintiff having taken said note after its maturity, holds the same subject to the said equities in favor of these defendants; that the said plaintiff is not a *bona fide* holder of said note, in due course, and these defendants have a right to set-off against their liability on said note the said sum of $1,410.88, aforesaid, and that the said defendants are ready and willing, and hereby offer to set-off and allow so much of the said sum of $1,410.88 against the sum of money remaining due and payable by virtue of the said note here sued on. And this the said defendants are ready to verify."

The import of the italics in the above quoted plea, which are ours, will appear later.

Special plea No. 3 is to the same general effect as special plea No. 1, except that it is filed by Mary Luck Stegal alone and alleges that the $1,410.88 (a part of the $5,000 deposit standing in her name and that of R. H. Moss as administrators) which she offers to set-off is a debt due by the bank to her in her individual capacity.

Special plea No. 2 is also filed by Mary Luck Stegal alone, and is to the same general effect as special plea No. 3, but contains this additional allegation:

"And this defendant, Mary Luck Stegal, further says

that subsequent to the aforesaid transactions, she has become the sole heir and distributee of the entire fund of five thousand dollars, or more; that she is now not only the sole owner of $1,410.88, that part of said fund comprising her commissions, but she is the sole owner of the residue of said deposit of five thousand dollars, or more."

██ ██ This allegation in special plea No. 2 is, in effect, a plea of a set-off against the bank which was acquired by descent cast after a receiver was appointed for it. Such after-acquired rights cannot avail her. A depositor's right of set-off against an insolvent bank is limited to indebtedness of the bank to the depositor existing at the time the bank suspended payment and was placed in the hands of a receiver. A set-off thereafter acquired, whether by assignment or by operation of law, cannot be pleaded against the receiver. The rule is well settled that a debtor of a bank who has acquired the right of a depositor by assignment after a receiver has been appointed for it cannot set the same off against an indebtedness owed by him to the bank at that time. *Exchange Bank* v. *Knox*, 19 Gratt. (60 Va.) 739; *Finney* v. *Bennett*, 27 Gratt. (68 Va.) 365; *Yardley* v. *Philler*, 167 U. S. 344, 17 S. Ct. 835, 42 L. Ed. 192; *Ellerbe* v. *Studebaker Corp.* (C. C. A.) 21 Fed. (2d) 933; Paton's Digest, volume II, section 4447 (a) ; 25 A. L. R. 954; 82 A. L. R. 672; 7 C. J. 746. On principle, the rule is the same where a set-off is acquired by operation of law. So far as it can be effective, special plea No. 2 and special plea No. 3 are to identically the same effect; and we shall not further notice special plea No. 2.

The plaintiff moved to strike out all the special pleas filed by the defendants. The court did not rule on this motion until all the evidence had been introduced and a verdict returned by the jury on the issue submitted to it. The court then struck out all the special pleas except special plea No. 1.

It is rather difficult to ascertain from the record the procedure which was followed on the trial of the case. But

as best we can get at it from the record, it seems to have been as is below stated.

It was agreed that the court should submit to the jury the issue, was the note sued on negotiated to the plaintiff an unreasonable length of time after its issue; and that the court should pass upon the other issues of fact and the questions of law presented by the pleas.

The court impaneled a jury saying to it, "I am going to limit the jury to the question of the reasonableness or unreasonableness of time. I do not think the jury has anything to do with the question of set-off." The plaintiff then introduced its evidence to prove the note; that it was negotiated by the Planters Bank to the plaintiff on December 11, 1930, and that it had taken the note for value and without notice of any equities, defenses, or rights of set-off existing between the bank and Miss Stegal and/or Moss. It also introduced the evidence upon which it relies to show that the note was not negotiated an unreasonable length of time after its issue.

In the testimony introduced by the plaintiff it was developed that this note had been transferred to the plaintiff as collateral security for a pre-existing loan which had been made by the plaintiff to the Planters Bank. During the cross-examination of plaintiff's witnesses counsel for the defendants undertook to ask them questions, the purpose of which was to prove, if possible, that the note had not been validly pledged to the plaintiff, because the Planters Bank had not complied with section 4149(49) of Michie's Virginia Code 1930 (Acts 1928, ch. 507, section 50, pages 1308, 1325-6). The court refused to permit this testimony to be introduced before the jury; but it permitted the witnesses to be asked and required them to answer the questions in the absence of the jury "for the purpose of the record." The same course was pursued during the examination of the witnesses for the defendants with reference to this point.

When it came to an examination of the witnesses with reference to matters having a bearing on whether the set-offs claimed by the defendants in their pleas would have

been valid set-offs as against the note in the hands of the receiver of the Planters Bank, the court pursued this course. Sometimes it would send the jury out and let the questions be asked and answered in the absence of the jury. At other times it permitted them to be asked in the presence of the jury; and instructed it that the evidence was stricken out so far as the question submitted to it was concerned. So far as it is necessary to state it, the evidence is as follows:

It is admitted that when the Planters Bank was closed and a receiver appointed for it, on December 12, 1930, Mary Luck Stegal had $115.95 on deposit therein to her personal credit, subject to check.

The uncontradicted evidence shows the following facts with reference to the deposit which stood upon the books of the bank in the name of Mary Luck Stegal and R. H. Moss, as administrators of W. H. Stegal, deceased, when the receiver was appointed. Prior to January, 1927, W. H. Stegal had died leaving as his sole heir and distributee his mother (Mary H. Stegal), and R. H. Moss (his uncle) and Mary Luck Stegal (his sister) had qualified as administrators of his estate.

The administrators kept an account in bank at the Planters Bank of Clarksville in their names as administrators of W. H. Stegal, in which they deposited money belonging to the estate. This account was a non-interest-bearing account. On October 24, 1930, the amount on deposit in this account was something over $5,000.

In December, 1929, the administrators settled their accounts before the commissioner of accounts; and in this settlement he allowed them under date of December 24, 1929, for their services as administrators commissions aggregating $2,821.77, no part of which had been paid to them or withdrawn by them from the estate. When the commissioner stated and settled their accounts all the debts of the estate had been paid. In his report of the settlement of their account, which was filed by him in the clerk's office at some time between December 25, 1929, and February 10, 1930, the commissioner reports in part as follows: "All

the stock embraced in the foregoing account as well as the funds received from all sources have been transferred and paid over to Mrs. L. H. Stegal, the mother and sole heir of the intestate, so that on the 25th day of December, 1929, nothing whatever in the way of money or stocks remains in the hands of the personal representatives."

At some time subsequent to December 25, 1929, R. H. Moss was paid one-half of the commissions ($1,410.88) out of the amount above mentioned as having been on deposit on October 24, 1929; but Mary Luck Stegal did not withdraw her half of the commissions. When the receiver for the bank was appointed there was a balance in this account of something over $3,580, all which, except $1,-410.88 (being the one-half of the commissions to which Mary Luck Stegal was entitled) was payable by the administrators to Mrs. Stegal, the sole distributee.

The testimony with reference to the origin and subsequent dealing with the note sued upon is this: In October, 1929, R. H. Moss and Miss Mary Luck Stegal were dealing in stocks on margin and were called by their brokers for additional margins. For some reason (possibly because the settlement of their accounts was still pending before the commissioner) instead of withdrawing from the funds on deposit to their order as administrators the amount to which they were entitled as commissions, they borrowed the amounts needed from the Planters Bank of Clarksville. The amount ($1,400) was borrowed on two notes drawn payable on demand to the order of Planters Bank of Clarksville, Virginia, which were signed by Mary Luck Stegal and endorsed by R. H. Moss before they were delivered to the bank. One of them is dated October 24, 1929, and drawn for $500. The other, which is the note here sued upon, is dated October 30, 1929, and drawn for $900. It is not clear from the evidence whether Moss was beneficially interested in the proceeds of these loans or not, but the fair inference from the evidence is that he was merely an accommodation endorser thereon. Moss handled the negotiations of these loans with the bank, and at the

time told the president of the bank not to let them go out of the bank. Miss Stegal had no personal contact with the bank. Both the president of the Planters Bank and Moss testify that it was agreed between the bank and Moss that no interest should be paid on the loans evidenced by these notes, because the above mentioned deposit was not bearing interest.

In August, 1930, a State bank examiner, who was examining the Planters Bank, raised a question as to why it had not collected any interest on these notes, and was told by an officer of the bank of the agreement the bank had made with Moss that no interest should be charged thereon. Then (according to the testimony of Wood, the president of the bank) the examiner directed him to make entries on the notes to the effect that the interest had been paid thereon and to charge to profit and loss the amount of the interest so entered on the notes. In obedience to this instruction Wood made the notation on the back of the $900 note above quoted, and charged $36 to profit and loss. A similar notation was made on the back of the $500 note, and the amount of interest credited thereon charged to profit and loss.

No interest was ever paid on the notes by the defendants, and neither of them authorized the bank to make a credit of interest on either of the notes, or knew that such a credit had been made until after the bank had failed.

About that time (August, 1930) Wood saw Moss on the street and told him that the bank examiner had been bothering him about these two notes, but nothing was said about interest or as to what objection the examiner had raised to the notes. Moss replied that "if it bothers the bank examiner one minute, you let me know, I will not take a day to come up here and pay these notes," Wood said, "that is all right," and the conversation ended there.

Both notes remained in the files of the Planters Bank until December 11, 1930. On that day the $900 note was negotiated to the Union Bank and Federal Trust Company to secure a pre-existing loan. At the same time, or a short

time before, the $500 note was negotiated to the American Bank and Trust Company for a like purpose. On December 12, 1930, the Planters Bank was placed in the hands of a receiver by the court.

The evidence proves that the Union Bank and Federal Trust Company took the $900 note in the usual course of business and for value. There is no evidence which tends to show that it had any knowledge or actual notice of any infirmity in the instrument, or of any defect in the title of the Planters Bank thereto, or of any equities or set-offs which Moss or Miss Stegal may have had against the Planters Bank, or that it had knowledge of any facts which made its action in taking the note tantamount to bad faith.. (See section 5618, Code Virginia 1919, which is section 56, N. I. L.)

To sustain its contention that the note was not negotiated to it an unreasonable length of time after its issue, the Union Bank and Federal Trust Company relies upon the notation "Int. Paid June 30, 1930 36.00," which was on the back of the note when it took it, and the testimony of C. T. Allen and W. A. Trotter as to when a demand note is treated as being past due according to the custom of bankers in the section of Virginia including Richmond and Clarksville.

Allen was introduced as a witness by the plaintiff. He was an assistant cashier of the plaintiff on December 11, 1930, and handled the transaction in which it acquired this note. His testimony is, that the custom is to treat a demand note as being past due paper when interest has not been paid on it for a year. Trotter was introduced as a witness by the defendants. His testimony was to the effect that it is the custom in the Clarksville section to regard a demand note as being past due paper when interest has not been paid on it for six months.

It is difficult to tell with certainty whether it was the understanding of counsel that, whatever might be the court's judgment on the motion of the plaintiff to strike out the defendants' special pleas, it should proceed to render a

final judgment on the record as made or not. But all parties seem to have acquiesced in the court's doing so, and we accept it as having been agreed that this should, and shall be done.

No objection was made by the plaintiff to any of the instructions given by the court to the jury upon the issue which was submitted by it. Among other instructions the court, in accordance with section 5754, Code Va. 1919 (section 193, N. I. L.), instructed the jury that in determining whether the note was negotiated a reasonable or an unreasonable length of time after its issue regard is to be had to the nature of the instrument, the usage of the trade or business with respect to such instrument and the particular facts of the case.

The jury returned the verdict, "We the jury on the issue joined find that the note herein sued on was negotiated within an unreasonable time after its issue."

The plaintiff moved the court to set aside the verdict on the ground that it was contrary to the evidence and without evidence to support it. The court overruled, this motion.

After setting forth that the court overruled the motion to set aside the verdict, the judgment entered by the court reads as follows:

"And the court now proceeding to pass upon the plaintiff's motion to strike out the pleas filed by the defendants claiming certain offsets against the note, and having heard argument of counsel and having maturely considered the questions raised by said pleas, the court is of opinion to sustain said motion, except as hereinafter mentioned. Thereupon, all of said pleas are stricken from the record, excepting the plea claiming the set-off of $115.95, which said sum is hereby allowed as an offset against the liability of the defendants on said note.

"It is thereupon considered by the court that the plaintiff, Union Bank and Federal Trust Company, recover of the defendants, Mary L. Stegal and R. H. Moss, the sum of $900 with interest thereon from the 26th day of August, 1932, until paid, together with the sum of $75 for and as

attorney's fee * * * subject, however, to a credit of $115.95, * * *."

The defendants below make the following assignments of error:

"1. The court erred in striking out all of the evidence relating to the agreement between the Planters Bank of Clarksville and petitioners that the note sued on should be kept in the files of the bank and paid on demand, or whenever payment was desired, out of $1,410.88 left on deposit in the bank for that purpose.

"2. The court erred in striking out all the evidence of petitioners to the effect that the note sued on was not validly pledged under Code, section 4149(49).

"3. The court erred in striking out petitioners' pleas of set-off and rendering judgment against them for the sum of $900, subject only to the credit of $115.95."

Under assignment of error number 3, they make the contention that the court erred in not holding that the entry on the back of the note "Int. Paid to June 30, 1930 36.00" constituted a material alteration of the note, which under section 5686, Code Va. 1919 (section 124, N. I. L.), avoided the note.

The plaintiff below makes the following assignments of cross-error:

(a) The court erred in not setting the verdict aside, and in not holding that it was a *bona fide* holder for value without notice and in due course of the note.

(b) The court erred in allowing the offset of $115.95.

It is not necessary to notice the defendants' second assignment of error further than to say that the court did not commit reversible error in this particular for this reason: The defense that the note sued upon was not validly pledged, because the Planters Bank had not complied with the provisions of section 4149(49), Michie's Code, Va. 1930, was not one of the defenses stated in the grounds of defense filed by the defendants. The object of requiring a statement of the grounds of defense is to apprise the plaintiff of the defenses upon which the defend-

ants intend to rely. They cannot, in effect, nullify it by stating therein that they intend to "rely upon all the defenses that can be properly raised under the plea of the general issue in this case." Notwithstanding such a dragnet statement, they cannot set up a defense which has not been stated with sufficient particularity to advise the plaintiff thereof.

■ The contention of the defendants that the court erred in not holding that the entry on the back of the note "Int. Paid to June 30, 1930 36.00" was a material alteration which avoided the note is not tenable.

■■ The notation is a memorandum made on the back of the note by the holder thereof, without the knowledge or consent of the maker or endorser; and it is without legal effect upon their rights or liabilities, but it is not in any sense an alteration of the note. Where a purchaser of a demand note relies upon things stated in a notation on the back thereof to establish that the note is not being negotiated an unreasonable length of time after its issue, he assumes the risk of the things stated therein not being true, and of the notation not having been authorized by the maker. If the facts therein stated are not true or the notation has not been authorized by the maker, the purchaser stands in the same position he would stand in had there been no such notation on the note. In the instant case the uncontradicted evidence is that no interest had been paid, and that the notation was made without the knowledge, authority, or acquiescence of the maker or endorser; and, as the court, in effect, correctly told the jury, the question whether the note was negotiated an unreasonable length of time after its issue is to be determined as if no such notation was on the back of it.

■ The cross-assignment of error that the court erred in refusing to set aside the verdict of the jury because it was contrary to the evidence is not well made. There was ample evidence to support the verdict.[1]

---

[1] The only case which has been called to our attention in which this court has considered whether a demand note had been negotiated an unreasonable length of time after its issue, is *Colona* v. *Parksley*

For the purposes of this case, it must be taken as having been established that this demand note was negotiated an unreasonable length of time after its issue, and it follows as a matter of law that the plaintiff is not a holder in due course. It stands in all respects in the shoes of a person to whom a note has been negotiated after its maturity.

Section 5615, Code Va. 1919 (section 53, N. I. L.): "Where an instrument payable on demand, *other than bank notes and certificates of deposit,* is negotiated an unreasonable length of time after its issue, the holder is not deemed a holder in due course." (The italicized words are not contained in section 53, N. I. L.)

The first and third assignments of error made by the plaintiffs in error are so interrelated that they will be treated together.

Special plea No. 1 read as a whole (*i. e.,* including the italicized words) pleads an *equity* which, independent of any statute of set-offs, attached to the note at the time of its transfer to the Union Bank and Federal Trust Company, and (as it is a post-maturity transferee thereof) ran with the note into its hands. *Schlamp* v. *Manewal,* 196 Mo. App. 114, 190 S. W. 658; *Guthrie* v. *Moore,* 182 N. C. 24, 108 S. E. 334. This being true, the court erred in striking out

*Nat. Bank,* 120 Va. 812, 92 S. E. 979. In that case it was held that a demand note dated August 24 and negotiated October 31 following was negotiated within a reasonable time.

In cases from other states the following lengths of time have been held unreasonable after issue for the negotiation of a demand note: *Ayer* v. *Hutchins,* 4 Mass. 370, 3 Am. Dec. 232, 8 months; *Morey* v. *Wakefield,* 41 Vt. 24, 98 Am. Dec. 562, 10 months; *Camp* v. *Scott (Clark),* 14 Vt. 387, 2 months; *Herrick* v. *Woolverton,* 41 N. Y. 581, 1 Am. Rep. 461, nearly 3 months; *Grossman* v. *Chechila,* 127 Miss. R. 151, 215 N. Y. S. 353, 1 year; *Greer* v. *Downing,* 176 Ill. App. 355, 1 year; *Stevens* v. *Bruce,* 21 Pick. (Mass.) 193, 3 months and 21 days; *Nevins* v. *Townsend,* 6 Conn. 5, nearly 9 months; *American Nat. Bank* v. *Patterson,* 145 La. 995, 83 So. 218, 7 A. L. R. 1563, 7 months; *State & City Bank & Trust Co.* v. *Hedrick,* 198 N. C. 374, 151 S. E. 723, nearly 9 months.

For other cases in which this question has been considered, see *McAdam* v. *Grand Forks Mer. Co.,* 24 N. D. 645, 140 N. W. 725, 47 L. R. A. (N. S.) 246; 60 A. L. R. 649; 3 R. C. L. 1045-6; 2 R. C. L. Perm. Supp. 963; 8 C. J., p. 408; and Cent. Dig., title Bills and Notes, section 348.

special plea No. 1. This also applies to special pleas No. 2 and No. 3. But the evidence introduced is insufficient to support a verdict or a judgment predicated upon a finding that the allegations made by the italicized words in the plea have been established; and for that reason and the reason hereafter stated, the court did not commit reversible error in this case by striking out these three pleas.

However, the italicized words may be treated as surplusage. When this is done the pleas present a very different aspect, and raise two very important questions, which so far as we can ascertain have never been decided authoritatively in Virginia. They are: (1) Do they plead what was a valid set-off against the note in the hands of the Planters Bank at the time it was negotiated to the plaintiff? (2) Does a post-maturity transferee of a negotiable note, who is a *bona fide* purchaser for value thereof from the payee, take it subject to a mere set-off (as distinguished from a payment and from a matter of recoupment) existing against the payee at the time of the transfer?

A strong argument can be made in support of the view that special pleas No. 1 and No. 2, omitting the words we have italicized in quoting special plea No. 1, plead, and that the evidence sufficiently proves, a valid set-off against the Planters Bank existing both at the time a receiver was appointed for it and when it transferred this note to the plaintiff.[2] "The trend of all modern decisions

[2] See *Ex parte Kingston* (Eng.) Law Rep., 5 Ch. App. 632 as explained in the case next cited; *Bailey* v. *Finch* (Eng. 1871) 7 Law Rep. Q. B. 34, 41 L. J. Q. B. N. S. 83, 20 Weekly Rep. 294, which is cited with approval in *National Bank* v. *Insurance Co.*, 104 U. S. 54, 64, 26 L. Ed. 693, and *Advance Exch. Bank* v. *Baldwin* (1930), 224 Mo. App. 616, 31 S. W. (2d.) 96; *Thomas* v. *Morristown State Bank*, 53 S. D. 499, 221 N. W. 257; *Reichert* v. *Bay City Bank*, 263 Mich. 322, 248 N. W. 636; *Andrew* v. *Dundee Sav. Bank*, 216 Iowa 240, 249 N. W. 154; *Miller* v. *Franklin Bank* (1829), 1 Paige (N. Y.) 444; *Comfort* v. *Patterson* (1878), 2 Lea (Tenn.) 670.

See also holding that deposits in name of a person in his official capacity may be set-off against his personal debt where he is personally liable therefor, *Funk & Son* v. *Young*, 138 Ark. 38, 210 S. W. 143, 144, 5 A. L. R. 79; *Coburn* v. *Carstarphen*, 194 N. C. 368, 139 S. E. 596, 55 A. L. R. 819.

See, also, *Hampton Roads F. & M. Ins. Co.* v. *Coburn Motor Car Co.*, 158 Va. 675, 164 S. E. 723, 726, 84 A. L. R. 731, where Justice

is towards liberality in the allowance of set-offs in the case of insolvency of the party against whom the set-off is claimed to the end that only the true balance may be required to be paid to the representative of the estate of the insolvent." *Funk and Son* v. *Young*, and other cases cited in the footnote. But it is not necessary to decide this question in this case, for the reason that the second question, which is the more fundamental of the two, is decisive of the case. To restate it, it is this: Does a post-maturity transferee of a negotiable instrument, who is a *bona fide* purchaser for value thereof from the payee, take it subject to a mere set-off (as distinguished from a payment and from a matter of recoupment) existing against the payee at the time of the transfer?

As we have said, so far as we can ascertain this question cannot be said to have been decided authoritatively in Virginia either before or since the negotiable instrument law was enacted in 1898 (Code, section 5563 *et seq.*). Though it is of vital importance in any view that can be taken of the case, in their original briefs and oral argument it was touched upon very lightly by counsel for plaintiff in error and was not noticed by counsel for the defendant in error. In order that it might have the assistance of counsel on this point, the court at its June term, 1934, set the case for argument on this question at its September term; and counsel for both sides have ably discussed the question in arguments which show careful examination into it.

---

Gregory speaking for the court quotes with approval the following language from 24 C. J., pp. 755-6, and similar language from *People* v. *California Safe Deposit & Trust Co.*, 168 Cal. 241, 141 Pac. 1181, L. R. A. 1915A, 309: "In order to warrant a set-off or counterclaim in an action by an executor or administrator, the debts must be mutual, and the principle of mutuality requires not only that the debts should be due to and from the same person, but also to and from the same person of the same capacity. It has been considered, however, that the rule of mutuality is not always controlling, but may be departed from where it appears that permitting the set-off cannot embarrass the administration or prejudice the rights of other persons interested in the assets. Where an administrator suing as such is insolvent, and a portion of the recovery will belong to him in his individual capacity, defendant may claim as in the nature of a set-off a demand in his favor against plaintiff in his individual capacity."

Our examination of this question convinces us that it must be answered in the negative, both under the law as it existed in Virginia prior to the enactment of the negotiable instrument law and under the law as it now exists.

Under the common law, cross-demands arising out of unconnected transactions require separate actions for their enforcement. And, save in a few cases which present peculiar equities, a defendant cannot avail himself of such a cross-demand against the plaintiff to prevent a recovery, in whole or in part, on his promise, without statutory authority for its being done. A mere cross-demand was not an equity which could be pleaded even in a court of chancery. Therefore, prior to the enactment of a statute of set-off, there was no occasion for the question here under consideration to have arisen. Indeed, it was a long time after the enactment of a statute of set-off before this question was decided or even discussed in any reported case, English or American.[3]

---

[3] Setting off at law cross-demands arising from unconnected transactions was introduced in Virginia long before it was allowed in England. The first statute of set-offs enacted in Virginia was the act of 1644-5 (1 Hen. St. 296). This, so far as we have been able to ascertain, was the first statute of set-offs enacted in any state or country which has the English common law as the basis for its legal system. The first statute of set-offs in England was enacted in 1728, 2 Geo. 2, ch. 22, section 13, and as modified and explained by the statute of 1734, 8 Geo. 2, ch. 24, section 5, it remained in force without change certainly until a comparatively late time.

The Virginia statutes relating to set-off enacted from 1644 to 1776, are as follows: Act of 1644-5, 1 Hen. St. 296; Act of 1645-6, 1 Hen. St. 314; Act of 1657-8, 1 Hen. St. 449; Act of March, 1661-2, 2 Hen. St. 110; Act of October, 1705, 3 Hen. St. 377, repealed by proclamation early in 1730; Act of May, 1730, 4 Hen. St. 275; Act of October, 1748, 6 Hen. St. 87. The last mentioned act was in force at the time Virginia declared her independence.

The Virginia statutes relating to set-off enacted 1776-1819 are the following: Acts 1786, ch. 68, 12 Hen. St. 358-9; Acts 1795, ch. 14, 1 Hen. St. (N. S.) 366; Acts 1806, ch. 8, 3 Hen. St. (N. S.) 288, the preamble to which reads, "Whereas doubts have arisen whether there is any law now in force regulating discounts and offsets in the courts of common law within this Commonwealth: For removing whereof, Be it enacted" etc.; Acts 1806, ch. 28, section 3, 3 Hen. St. (N. S.) 305; act passed Jan. 13, 1818, 1 Rev. Code 1819, ch. 125, pp. 483-4; section 87 of act passed Feb. 25, 1819, 1 Rev. Code 1819, ch. 128, section 87, p. 510.

Most of the Virginia acts passed in 1705 and subsequently not only

The nearest analogy to the set-off of a cross-demand against a post-maturity transferor of a negotiable instrument in an action brought thereon by the transferee with which the custom of merchants, or the law merchant, in England or America, could have been concerned prior to the enactment of a statute of set-offs was a payment thereon made to the transferor.

 Under the common law a payment made to the payee of a non-negotiable instrument at any time before the promisor received notice that the instrument had been assigned to another was a defense *pro tanto* to the instrument in the hands of the assignee.

This was true because the assignee took only the equitable title to the instrument. He could not sue thereon in his own name either in equity or at law. The suit or action had to be brought by, or in the name of the assignor, for the benefit of the assignee. Whether the suit was brought in equity or at law,[4] the assignee stood at the bar in fact as in name in all respects in the shoes of his assignor, with two exceptions. These two exceptions were (a) if the defendant had received notice of the assignment, the assignee was permitted to take the shoes of the assignor at the time the defendant received notice, and (b) as the action was for his benefit the assignee had to allow all defenses which had accrued against the instrument in his hands.

"Holding only the equitable title it naturally followed (as it still does)[5] that the assignee took the instrument or claim *subject to all defenses* and other equities (in favor of the promisor) with which it was encumbered in the hands of

---

contain provisions authorizing the set-off of cross-demands between plaintiff and defendant, but also authorize an assignee of a chose in action to sue thereon in his own name, with the proviso that the assignee shall allow set-offs which the defendant has against his assignor.

[4] The assignee was from an early time permitted to sue at law in the name of the assignor. *Master* v. *Miller* (1791), 4 Term Rep. 330.

[5] That is since the enactment of statutes authorizing an assignee to sue in his own name. Such a statute does not operate to effect the transfer of the legal title by an assignment of a non-negotiable chose in action. *Norton* v. *Rose*, 2 Wash. (2 Va.) 247; *Davis* v. *Miller*, 14 Gratt. (55 Va.) 1.

the assignor and subject further to any equity which the original promisor had acquired since the assignment but before receiving notice thereof." Bigelow on Bills, Notes & Checks (Lile's 3d Ed.) section 10.

So far as we have been able to find there is no reported case decided prior to the enactment of a statute of set-offs in which it was decided whether, where the payee of a negotiable instrument transferred it after its maturity, the transferee took it subject to payments made to the payee by the promisor either before the transfer, or thereafter, and before the promisor received notice of the transfer.

But it can safely be said with reference to *payments* that the consensus of opinion of the courts and text-writers who have considered the subject with any degree of care is this. Under the Law Merchant (independent of a statute of set-offs) a post-maturity transferee of a negotiable instrument takes it subject to all payments made by the promisor after its maturity to a prior party while he was the holder thereof. But, if he be a *bona fide* purchaser for value, he does not take it subject to payments made after the transfer, though the promisor may have no notice of the transfer. *Davis* v. *Miller,* 14 Gratt. (55 Va.) 1; *Peabody* v. *Peters,* 5 Pick. (Mass.) 1; *Baxter* v. *Little,* 6 Meta. (Mass.) 7, 39 Am. Dec. 707; *Wheeler* v. *Guild,* 20 Pick. (Mass.) 545, 553, 32 Am. Dec. 231; *Shirley* v. *Todd,* 9 Greenl. (Me.) 83; *Hanson* v. *Roesch,* 104 Wash. 257, 176 Pac. 349; *Curlee* v. *Ruland,* 56 Okl. 329, 155 Pac. 1182.

In this connection it should be noted that, where it is expressly or impliedly agreed between the promisor and the payee that a cross-demand of the promisor shall be applied as a credit on the instrument, it ceases to be a mere set-off. It becomes a payment, and the rules applicable to payments apply instead of those applicable to set-offs. *Collenridge* v. *Farquharson* (1816) 1 Stark. 207, and cases above cited. The failure to give full weight to this principle has caused some confusion of thought or statement in some of the cases dealing with the subject of set-offs which have accrued against prior parties.

However, the rule of the Law Merchant with reference to payments made to the transferor of a negotiable instrument who has negotiated it after it is past due, is not determinative of the question we have under consideration, because such payments, even though made after the transfer, do not arise from a purely collateral matter. But it does establish that it cannot be accurately said that under the Law Merchant a post-maturity transferee of a negotiable instrument takes it "subject to the same defenses as if it were non-negotiable," unless they have been cut off by a prior negotiation in due course before maturity. Were the instrument non-negotiable the assignee would take it subject to payments made after the assignment, if made before the promisor received notice of the assignment; but it was not so as to negotiable instruments, unless so provided by some statute.

We shall have to pursue our inquiry further to determine what effect the enactment of a statute of set-offs had and has upon the rights of a post-maturity transferee of negotiable paper.

In discussing this question it is necessary to distinguish between what we shall denominate a simple statute of set-offs and a statute which provides that the assignee of a chose in action may sue thereon in his own name but shall allow either all or some of the set-offs which would be good against his promise in the hands of his assignor.

By a simple statute of set-offs we mean a statute which simply provides that, in an action brought against a defendant on his promise to pay, the defendant may have set-off against the demand of the plaintiff any cross-demands in the nature of a debt due which he has against the *plaintiff*. The first statute of set-offs enacted in Virginia (1644-5) 1 Hen. St. 296,[6] the English statute of set-offs of 1728

---

[6] Act of Feb. 2, 1644-5, 1 Hen. St. 296: "Be it enacted by the authorities of this present Grand Assembly for avoiding causes and suits of law, that where any suit shall be commenced either in quarter court or county court, that if the defendant have either bill, bond or accompt of the plt. wherein he proves him debtor, that in such cases the courts do balance acc's. consideration being had and allowance given to the plt. for his charges who first began his suit, as

(2 Geo. 2, ch. 22, section 13),[7] and section 4, ch. 172, Code Va. 1849; section 3298, Code 1887, and section 6144, Code Va. 1919, are all what we have denominated simple statutes of set-off.

The early Massachusetts and New York statutes of set-off were also simple statutes of set-off, without more.

So far as we have been able to ascertain, no statute relating to an assignee of a chose in action suing in his own name or to his allowing set-offs against his assignor was enacted in England until the enactment of the Judicature Act of 1873, 36 & 37 Vic., C. 66, section 25, except the statute of 3 & 4 Ann, C. 9, which was enacted in 1704. The last mentioned statute is the statute which declared that notes payable to a person or his order or to bearer, shall be negotiable, and that the payee or transferee thereof may sue thereon as upon a bill of exchange.

In Virginia[8] and most of the other American states, statutes were enacted at an early date (in some instances long before 1776) which provide that an assignee of a promise to pay, or of specified classes of such promises, may sue thereon in his own name, but that he shall allow either all or certain specified set-offs against his assignor. But in most instances when these statutes were enacted, there had been in existence for some years a simple statute of set-offs. To distinguish this class of statutes from statutes of

alsoe to the time when such bills, bonds, accompts or demands were due to be compared with the acco. in ballance, And this act to continue till the next assembly."

[7] 2 Geo. 2, ch. 22, section 13: "Where there are mutual debts between the plaintiff and defendant, or if either party sue or be sued as executor or administrator, where there are mutual debts between the testator or intestate and either party, one debt may be set against the other; and such matter may be given in evidence upon the general issue, or pleaded in bar, as the nature of the case shall require, so as at the time of his pleading the general issue, where any such debt of the plaintiff, his executor or intestate is intended to be insisted on in evidence, notice shall be given of the particular sum or debt so intended to be insisted on, and upon what account it became due, or otherwise such matter shall not be allowed in evidence upon such general issue."

[8] The Virginia statute of set-offs of March, 1661-2, 2 Hen. St. 110, recognized the right of a defendant to plead, under certain circumstances, as a set-off a cross claim against the plaintiff which had been

simple set-off we shall designate them, and hereafter refer to them, as statutes allowing prior party set-offs. Most of the American cases in which the subject here under discussion has been passed upon turn upon whether the local statute allowing prior party set-offs expressly or by implication applies to a negotiable instrument which is negotiated after its maturity.

Immediately upon the enactment of a simple statute of set-offs it naturally followed, as a matter of course, that an assignee of a non-negotiable instrument took it subject to set-offs (in favor of the promisor) to which it was subject in the hands of the assignor at the time of the assignment, and also subject to any set-offs against the assignor which the original promisor might acquire after the assignment before he received notice of it. (See *ante*.) But this did not follow as to a negotiable instrument even when it was transferred after maturity.

It is a *sine qua non* of negotiability that the legal title, as well as the equitable title, of the instrument shall pass to a transferee thereof either by indorsement and delivery, or by delivery only, so that the transferee thereof can sue thereon in his own name independent of any statute upon the subject. *Clerke* v. *Martin* (1805) 2 Ld. Raym. 757, 1 Salk. 129, 1 Chitty, Jr., 219; *Buller* v. *Crips* (1704) 6 Mod. 29, 1 Salk. 130, 2 Ld. Raym. 757, 1 Chitty, Jr., 222; 1 Daniels on Neg. Inst. (6th Ed.) section 1. And under the Law Merchant as well as under the Negotiable Instruments Law, "an instrument negotiable in its origin continues to be negotiable until it has been restrictively endorsed or discharged by payment or otherwise." Section 5609, Code Va. 1919; section 47, N. I. L.; section 36, Eng.

assigned to him. But the first Virginia statute authorizing a plaintiff to sue in his own name on a chose in action which had been assigned to him was the act of 1705, 3 Hen. St. 377. The third paragraph of this act is a simple statute of set-offs. The following paragraphs provide. that the assignee of "any bond or bill for debt" may sue thereon in his own name, with the proviso, that he "shall be obliged to allow all discounts as aforesaid that the defendant can prove either against himself or the first. obligee." For subsequent Virginia statutes on this subject see note 3, *ante*.

B. of Exc. Act, 45 & 46 Vic., C. 61; *Taylor* v. *Mather* (1787) B. R. Pasch. 27, Geo. 3, 3 Term Rep. 83, n, 1 Chitty, Jr., 439; *Callow* v. *Lawrence* (1814) 3 M. & S. 95, 97; *Davis* v. *Miller,* 14 Gratt. (55 Va.) 1, 5.

This being true, on principle, the enactment of a simple statute of set-off is not sufficient to enable the maker of a negotiable promise to pay to set-off against a transferee thereof, either before or after maturity, a set-off which he has against the payee or any other prior holder thereof. For him to be able to do this, there must be (in addition to a simple statute of set-off) some statutory provision which either expressly or impliedly authorizes it to be done.[9]

The great weight of authority, English and American, supports the view that there is no rule of the Law Merchant which, operating in conjunction with a simple statute of set-offs, has the effect of providing that a *bona fide* purchaser for value, to whom a negotiable instrument is negotiated after its maturity, takes it subject to mere set-offs against any prior party. Or to state it affirmatively instead of negatively, under the Law Merchant applied in conjunction with a simple statute of set-offs the indorsee of a past due negotiable instrument does not take it subject to mere set-offs against any prior party. He takes it subject only to equities attaching to or inherent in the instrument itself at the time of the transfer, and equities arising out of the transaction giving rise to the instrument which exist (though they may not have fully developed) at the time of the transfer. Daniels on Neg. Inst. (6th Ed.) section 725 and sections 1435a-1437; Bigelow on Bills, Notes & Checks (1st Ed., 1893) pp. 227-228 (2d Ed.) 256, and (Lile's 3d Ed.) section 551; 2 Rob. Pr. (New Ed.) 252, 253; *Burrough* v. *Moss* (1831), 10 B. & C. 558, 21 Eng. C. L. 128;

[9] In notes in 23 L. R. A. 325 and 39 L. R. A. (N. S.) 658, will be found collections of the early and some of the later American cases dealing with this subject. But, as pointed out by Prof. Lile in his notes to Bigelow on Bills, Notes and Checks (3d Ed.) section 551, the annotator does not undertake in all instances to distinguish upon the facts between cases involving payments, recoupments and technical set-offs. And most of the cases cited in these notes plainly turn on local statutes which are not simple statutes of set-off.

*Davis* v. *Miller* (1857) 14 Gratt. (55 Va.) 1; *Davis* v. *Noll,* 38 W. Va. 66, 17 S. E. 791, 45 Am. St. Rep. 841; *National Bank of Washington* v. *Texas,* 20 Wall. (87 U. S.) 72, 22 L. Ed. 295; *Stedman* v. *Jillson* (1833) 10 Conn. 55; *Carpenter* v. *Greenop,* 74 Mich. 664, 42 N. W. 276, 4 L. R. A. 241, 16 Am. St. Rep. 662; *La Due* v. *First Nat. Bank,* 31 Minn. 33, 36, 16 N. W. 426; *Leavitt* v. *Peabody,* 62 N. H. 185; *Hughes* v. *Large,* 2 Pa. St. 103; *Long* v. *Rhawn,* 75 Pa. St. 128; *Pusey & Jones Co.* v. *Hanssen* (C. C. A.) 279 Fed. 488.

It was so held in the first reported English case on the subject, *Burrough* v. *Moss, supra,* and this has been uniformly the holding of all subsequent English cases. 2 Daniels on Neg. Inst. (6th Ed.) section 1436; 2 Halsbury's Laws of Eng. (2d Ed.) 659.

The earliest American cases on this subject which have come to our attention are the New York and Massachusetts cases below cited, which were decided when the only statute of set-offs that had been enacted was what we have designated a simple statute of set-offs. There are some *dicta* on the subject in a few earlier cases, but what is said is pure *dictum* very casually expressed.

The earliest American case is *O'Callaghan* v. *Sawyer* (N. Y. 1809), 5 Johns. 118. In this case in a very short *per curiam* opinion which shows little evidence of any careful consideration of the subject, the court held that a post-maturity transferee of the payee of a negotiable instrument took it subject to set-offs against the payee. But, as is pointed out in *Miner* v. *Hoyt* (N. Y. 1843) 4 Hill 193, the soundness of this decision was questioned in later cases; and prior to 1829 the matter was put at rest by a statute (2 Rev. St. of N. Y. 1829, pt. 3, c. 6, tit. 2, p. 354, section 18, subd. 8; 3 Rev. St. N. Y. 1859, pt. 3, c. 6, tit. 2, p. 635, section 12, subd. 9). This statute in express terms provides that a negotiable instrument which is transferred after maturity shall be subject to set-offs existing against any person "who shall have assigned or transferred such note or bill after it became due, if the demand be such as

might have been set-off against the assignor while the note or bill belonged to him."

In *Holland* v. *Makepeace* (1812), 8 Mass. 418, the court reached the same conclusion on this subject that the English court reached some nineteen years later in *Burrough* v. *Moss, supra.* But though there had been no change in the Massachusetts statutes on this subject, in *Sargent* v. *Southgate* (Mass. 1827), 5 Pick. 312, 16 Am. Dec. 409, the court held that, by virtue of its statutes of set-off, a post-maturity transferee took a negotiable instrument subject to set-offs against the transferee existing at the time of the transfer. Its reasoning is largely summed up in these words from the decision: "After a great deal of deliberation with a view to other cases before us, as well as this, we have come to the conclusion, that the defendant may avail himself of these just and equitable claims against Watson, under the statute of set-off. That statute is remedial and ought to have a liberal construction; * * *."

Though the decisions in *O'Callaghan* v. *Sawyer* and *Sargent* v. *Southgate* cannot be sustained on principle, they have been followed in some other cases by the courts of these and other states. But usually with the qualification made in *Baxter* v. *Little* (1843) 6 Metc. (Mass.) 7, 39 Am. Dec. 707, that in the case of negotiable paper the right to plead a set-off against a prior party "must be confined to those demands against the payee or prior holder, which accrued to the defendant, whilst such payee or prior holder was the actual holder of the note, and will not extend to demands which accrued afterward, although no notice of the indorsement was given to the debtor." If the view taken in *O'Callaghan* v. *Sawyer* and *Sargent* v. *Southgate* be sound, it is difficult to find any sound basis for this qualification.

In Bigelow on Bills, Notes and Checks (Lile's 3d Ed.) section 551, the author, Prof. Lile, has this to say on this subject:

"Before passing from the nature of equities it should be stated that the term does not embrace *set-offs* or counterclaims held by the defendant against the payee or other

transferor of the holder, and arising from *collateral* transactions; but only those defenses *inherent* in or directly connected with the contract giving rise to the instrument itself. * * *

"* * * set-offs are in no sense 'defenses' to a negotiable (or non-negotiable) instrument. They do not constitute 'defects of title' nor 'infirmities' in the instrument, nor do they in anywise discredit the paper. Without aid of statute they may be availed of only in a separate and independent suit. They do not therefore reduce, nor extinguish, nor in anywise affect the main debt by operation of law—as they do by the civil law (under the principle of *compensatio*)— until the parties have accounted together, and the set-offs have been accepted as credits or payments. Statutes now permit the defendant, owner of the set-off, to assert it in the suit on the main debt by the holder (debtor in the set-off), by a cross-action therein. * * *

"But the holder of the set-off is under no obligation thus to assert it, and may still maintain his independent action even after judgment against him on the principal debt. An 'equity' ('recoupment') on the other hand, the moment it arises (equitably) reduces or extinguishes (as between the parties) by operation of law, the amount due to the payee, and may be asserted only as a defense in the action on the instrument, or on the contract giving rise to it.

"The consequence is that one who is otherwise a holder in due course is not affected by the existence of set-offs held by the maker against his transferor, even though having actual knowledge of their existence at the time of his purchase, or being a post-maturity purchaser. Knowledge of a 'set-off,' therefore, is not knowledge of an 'equity'—save of course, where local statute otherwise provides."[10]

---

[10] In his note to the above quotation, Prof. Lile says: "Whether a set-off is available against a transferee not in due course will depend upon the local statute" of set-off, and cites section 5768 and section 6144, Code Va. 1919, as the applicable Virginia statutes. But he expresses no opinion as to whether these sections, when read alone or in conjunction with section 5620 (section 58, N. I. L.), have the effect of making the set-off against a transferor available against his transferee.

When we come to consider whether a post-maturity trans-feree of a negotiable instrument takes it subject to set-off against prior parties by virtue of a statute of the class which we have designated as statutes allowing prior party set-offs, the question turns on the language of the local statute. And cases dealing with the subject are of little value unless you have before you the statute which is being construed.

However, long before 1896, when the Negotiable Instruments Law was drafted, a large majority of the states had enacted statutes which either in terms, or by plain implication, provided that a post-maturity transferee of a negotiable instrument shall take it subject to set-offs existing against the transferor at the time of the transfer. In some of them the statute on the subject either expressly or by plain implication put the post-maturity transferee of a negotiable instrument on the same footing with reference to set-offs on which it placed the assignee of a non-negotiable instrument; but in many, perhaps most, of them, the statute limited the set-off against prior parties to which a negotiable instrument transferred after maturity is subject to those existing at the time of the transfer.

The earliest statute of this kind to which our attention has been called is the Vermont Act of 1798 (Comp. L. Vt. 1824, p. 144). This statute by its express terms applied to both non-negotiable and negotiable instruments. (We presume it was meant past due negotiable instruments, though the statute does not say so.) It provided that the defendant might plead "an offset, of all demands proper to be placed in offset, which the defendant or defendants may have against the original payee or payees, before notice of such endorsement, against the endorsee or endorsees." See *Martin* v. *Trobridge* (1829) 1 Vt. 477.

Long prior to 1896 the following states, among others, had enacted statutes prescribing the extent to which set-offs against an assignor should be allowed against an assignee of a chose in action, with the proviso that the statute shall not apply to a *bona fide* purchaser for value of a nego-

tiable instrument before it is past due. Alabama (Code 1876, sections 2099, 2100, 2995) ; Iowa (Code 1873, section 2546) ; Kansas (Rev. St. 1868, p. 635) ; Nebraska (Comp. St. 1887, p. 744, sections 29-31; Cobley's Ann. St. 1903, sections 1027-1029) ; North Carolina (Code Civ. Proc. 1868, section 55; Clark's Code Civ. Proc. 1900, section 177) ; South Carolina (Rev. St. S. Car. 1873, p. 594, section 135) ; Washington (2 Hill's St. & Codes 1891, section 806). The Colorado statute was much to the same effect. Gen. St. Colo. 1883, ch. 9, sections 103-110. The implication here is plain that such statutes provide that a post-maturity transferee shall take a negotiable instrument subject to the same set-offs as an assignee of a non-negotiable instrument takes it under the statute, unless otherwise provided by some other statutes. The Tennessee statute (St. Laws of Tenn. 1873, section 2918) also by strong implication, if not indeed in express terms made set-offs against the transferor available against a post-maturity transferee of a negotiable instrument.

In Minnesota and Wisconsin thère were statutes to the same effect (Gen. St. Minn. 1878, ch. 66, section 27) ; Wisconsin Rev. St. 1878, section 4258; but another section of the revised statute expressly limited the set-offs against prior parties which might be pleaded against a post-maturity transferee of a negotiable instrument to set-offs existing at the time of the transfer. Perhaps there were similar restrictive acts in some of the other states mentioned in the paragraph above, but time has not permitted us to search for them.

In New York, Illinois and Michigan there was one statute relating to set-offs against assignees of non-negotiable instruments and another statute which in terms provided that set-offs against the transferor of a past due negotiable instrument, existing at the time of the transfer, shall be good against the instrument in the hands of his transferee. 2 Rev. St. N. Y. 1829, pt. 3, c. 6, tit. 2, p. 354, section 18, subd. 8; 3 Rev. St. N. Y. 1859, pt. 3, c. 6, tit. 2, p. 635, sec-

tion 12, subd. 9; Rev. St. Ill. 1874, ch. 98, section 12; Comp. L. Mich. 1871, p. 1679, section 5796, subd. 9.

The general statute of set-offs in Virginia is section 6144, Code Va. 1919. So far as it is here material, its provisions are the same as those of the corresponding earlier statutes running back to 1705. The corresponding sections of the earlier codes are Code 1887, section 3298; Code 1849, ch. 172, section 4, p. 654; 1 Rev. Code, 1819, ch. 128, section 87. On principle none of these sections had or has the effect of making a negotiable note transferred after its maturity subject in the hands of the transferee to mere set-offs against prior parties. They create no set-offs. They merely permit a defendant in an action brought on his promise to set-off against the demand of the plaintiff any cross-demand in the nature of a debt due which he has against the *plaintiff*.

*Davis* v. *Miller, supra,* did not involve a mere set-off, but a payment made to the payee of a past due negotiable note after he had transferred it to a post-maturity transferee who was a *bona fide* purchaser for value, but before the maker had received notice of the transfer. But as the general statute of set-offs then in force (Code 1849, ch. 172, section 4)[11] to a degree linked up payments with set-offs, the court felt called upon to pass upon the question of whether that section operated to make a negotiable instrument in the hands of a post-maturity transferee subject to either a payment made by or a set-off acquired by the payee after the transfer. It held that it did not.

In *Davis* v. *Miller* the court also discussed at some length whether that statute operated to make a negotiable instrument in the hands of a post-maturity transferee subject to

---

[11] The material parts of Code 1849, ch. 172, section 4, and section 3298, Code 1887, read as does the material part of section 6144, Code Va. 1919, except for an immaterial change in the words which are italicized in quoting it:

Section 6144, Code Va. 1919: "In any action for any debt, the defendant may at the trial prove, and have allowed against such debt, any payment or set-off which is so described in his plea, or in an account filed *with the papers in the cause,* as to give the plaintiff notice of its nature, but not otherwise."

set-offs existing against a prior party at the time of the transfer. But it left this question open, saying that it was not called upon to decide it; and it is not authoritatively decided in any reported Virginia case decided before or since, so far as our examination has disclosed. But the reasoning of the court in *Davis* v. *Miller* supports the view that this statute does not make a negotiable instrument in the hands of a post-maturity transferee, who is a *bona fide* purchaser for value, subject to mere set-offs against a prior party existing at the time of the transfer; and, as has been heretofore indicated, in our opinion that is the correct view.

The only other Virginia statute which, prior to the enactment of the Negotiable Instruments Law in 1898, could have that effect is the statute authorizing an assignee of a promise to pay to sue thereon in his own name, with the proviso that he shall allow all just discounts against his assignor. (Discounts as used in this and similar statutes have always been held in Virginia, and in all other jurisdictions so far as we can ascertain, to include mere set-offs.)

From 1818 to 1849 the statute corresponding to section 5768, Code Va. 1919, which was in effect was 1 Rev. Code 1819, ch. 125, sections 5 and 6, which are quoted in the footnote.[12] This statute is similar to the earlier acts on the subject, though in some respects, which need not be noticed here, it is materially different from them. There is room

---

[12] 1 Rev. Code 1819, ch. 125, sections 5 and 6:

5. "Assignments of all bonds, bills and promissory notes, and other writings obligatory, whatsoever, shall be valid; and an assignee of any such may thereupon maintain any action, in his own name, which the original obligee or payee might have brought, but shall allow all just discounts, not only against himself, but against the assignee, before notice of the assignment was given to the defendant.

6. "The assignee, or assignees, his, her or their executors or administrators, of any bill, note or obligation, shall hereafter be entitled to recover from any previous assignor or assignors, his, her or their executors or administrators; provided, that, in any suit brought against a remote assignor or assignors, his, her or their executors or administrators, he, she or they shall be subject only to such recovery, and shall have the benefit of the same defense, as if the suit had been instituted by the immediate assignee or assignees; and provided, also, that no joint action shall be commenced or prosecuted against any two or more persons, unless when they shall be joint assignors. But nothing in this act contained shall be so con-

for argument that the words, "bonds, bills, and promissory notes, and other writings obligatory whatsoever" as used in this statute and the somewhat similar terms used in earlier statutes, should be construed to include past due negotiable instruments.[13] But when it is borne in mind that bills of exchange are dealt with in a separate section and that notes payable to a person or his order, were not negotiable in Virginia until made so by the Code of 1849,[14] the negative seems to us to have the better of the argument. However, this is a question which has not been decided in any reported case, and it is not necessary to decide it here.

But in the revision of the Code of 1849, this statute was repealed and sections 14 and 15, ch. 144, Code 1849, was substituted in its place. Except for the italicized words, which were inserted or added when the Code of 1887 was enacted, these two sections of the Code of 1849 were in exactly the same language as section 5768 and section 5769 of the Code of 1919, which are quoted in the footnote.[15]

As is pointed out and held in *Davis* v. *Miller, supra,* section 14, ch. 144, Code 1849, by express provision is limited in its application to non-negotiable instruments, and cannot be construed to apply to negotiable instruments negotiated after maturity, because an instrument negotiable in its origin continues to be negotiable until it has been restrictively endorsed or discharged by payment or otherwise. The

strued, as in any manner to abridge or destroy any rights which endorsers of bills of exchange, or assignees of bonds, notes and obligations, now are entitled to by law, or to which they were entitled on the first day of April, in the year of our Lord one thousand eight hundred and seven."

[13] See *Perry* v. *Mays* (1831), 2 Bailey (S. Car.) 354, in which the court held that the act of 1798 (St. of S. Car. ed. 1839, p. 330) which was a statute somewhat similar to 1 Rev. Code Va. 1819, ch. 125, sections 5 and 6 applied to past due negotiable instruments. The language used in that statute was "bond, note or bill."

[14] *Bank of Metropolis* v. *Jackson's Adm'r* (1835), 9 Leigh (36 Va.) 221; Code 1849, ch. 144, section 7, p. 581, making some but not all notes drawn payable to a person or his order, or bearer, negotiable. It is also interesting to note that the statute passed in 1777 (9 Hen. St. 431), which remained in effect for many years, made it unlawful to "issue" or "offer" a "bill of credit or note" payable to *bearer* which was drawn by a private person.

[15] Section 5768, Code Va. 1919: "The assignee or beneficial owner

correctness of the decision in *Davis* v. *Miller* on this point has never been questioned so far as we know; and it applied with full force to section 2860, Code 1887 (now section 5768, Code Va. 1919), which was in effect when the Negotiable Instruments Law was enacted in Virginia in 1898, and still applies to that statute, unless it has been made applicable to negotiable instruments negotiated after their due dates by section 5620, Code Va. 1919 (section 58, N. I. L.).

Our conclusion is that, under the law as it existed in Virginia at the time the Negotiable Instruments Law was adopted (1898) a post-maturity transferee of a negotiable instrument, who was a *bona fide* purchaser thereof for value, did not take it subject to mere set-offs existing at the time of the transfer against his transferor or any other prior party; and if he has done so since 1898 it is only by virtue of section 5620 (section 58, N. I. L.) operating in conjunction with what is now section 5678. Section 5620 reads:

"Section 5620. When subject to original defenses.—In the hands of any holder other than a holder in due course a negotiable instrument is subject *to the same defenses as if it were non-negotiable*. But a holder who derives his title through a holder in due course and who is not himself a party to any fraud or illegality affecting the instrument has all the rights of such former holder in respect of all parties prior to the latter. (Italics ours.)

 At first blush it may appear that section 5620 in

of any bond, note, writing or other chose in action, not negotiable, may maintain thereon in his own name any action which the original obligee, payee, or contracting party might have brought, but shall allow all just discounts, not only against himself, but against such obligee, payee, or contracting party, before the defendant had notice of the assignment or transfer by such obligee, payee, or contracting party, *and shall also allow all such discounts against any intermediate assignor or transferrer, the right to which was acquired on the faith of the assignment or transfer to him and before the defendant had notice of the assignment or transfer by such assignor or transferrer to another."* (Italics ours.)

Section 5769, Code Va. 1919: "Any such assignee or *beneficial owner* may recover from any assignor of such writing; but only joint assignors shall be joined as defendants in one action, and a remote assignor shall have the benefit of the same defense as if the suit had been instituted by his immediate assignee." (Italics ours.)

effect makes the provisions of section 5768 and section 6144 applicable to a negotiable instrument negotiated after its maturity. But that view has been seriously controverted on the ground that "defenses" was used in section 58, N. I. L. in the same sense that it was used in the Law Merchant (*i. e.,* technical defenses as distinguished from set-offs), and does not embrace within its meaning set-offs. A careful examination of the subject leads us to the conclusion that this is the correct interpretation of the word "defenses."

The view of the author in Bigelow on Bills, Notes and Checks (Lile's 3d Ed.) section 551, would *seem* to be that section 5620 (section 58, N. I. L.) does not operate to make a statute of set-off apply to a past due negotiable instrument if it would not apply if section 5620 had not been enacted, because a set-off is not a *defense.*

In Burks' Pl. & Pr. (1st Ed.) p. 441, after speaking of the effect under the Virginia statutes of set-off against assignors of non-negotiable choses in action, Judge Burks says: "If, however, the paper be negotiable, though transferred after maturity, set-offs acquired after transfer, even without knowledge of the transfer will not avail against the holder, as the holder takes the legal title discharged of such equities," citing *Davis* v. *Miller, supra.* In a footnote to this sentence he says: "It is not believed that this question is affected by section 58, Nego. Inst. Act."

The Negotiable Instruments Law was drafted in 1896 by the National Conference of State Board of Commissioners for Promoting Uniformity of Legislation in the United States. It was submitted by the National Conference to the legislatures of the several states in a report in which notes were appended to the several sections thereof. These notes bear the same relationship to the sections of the N. I. L. that the notes of the revisors do to the sections of our Codes. Note "a," which was appended to section 58 by a notation placed after the word "non-negotiable," reads:

"Note (a). It is not deemed expedient to make provision as to what equities the transferee will be subject to; for the

matter may be affected by the statutes of the various states relating to set-off and counter-claim. On the question whether only such equities may be asserted as attach to the bill, or whether equities arising out of collateral matters may also be asserted, the decisions are conflicting. In an act designed to be uniform in the various states, no more can be done than fix the rights of holders in due course."

In a *dictum* in *Citizens' Bank* v. *Chase,* 151 Va. 65, 69, 144 S. E. 464, 465, the court has this to say:

"The plaintiff in error * * * seems to rely with perfect confidence upon the case of *Davis* v. *Miller,* 14 Gratt. (55 Va.) 1, and particularly upon this statement there made. 'A note' does not cease to be negotiable because it is overdue. The promisee by his endorsement may give good title to the endorsee. Notes or other matters of set-off acquired by the defendant after such transfer cannot be given in evidence in defense of such note, although the maker had no notice of such transfer at the time of acquiring his demands against the promisee.'

"This general statement, in view of Code, section 5620, Negotiable Instruments Law, section 58, should doubtless now be qualified, because among other things it provides that 'in the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable.' "

But upon an examination of the subject we are of opinion, on authority and upon principle, that this *dictum* was not well spoken.

In our examination of the cases decided since the Negotiable Instruments Law was enacted, we have found only two cases in which the point here under consideration can be said to have been expressly and authoritatively decided —*Lincoln* v. *Grant* (1918), 47 App. Cas. D. C. 475, and *Litcher* v. *North City Trust Co.* (1933) 11 Pa. Super. 1, 169 Atl. 409.

*Lincoln* v. *Grant* holds that defenses, as used in section 58, N. I. L., does not include set-offs. There are several other cases which, though perhaps they cannot be said to

have authoritatively so held, come very close to having done so. See *Worden* v. *Gillett* (D. C.) 275 Fed. 654, 656; *Clark* v. *Wheeler*, 81 N. H. 34, 121 Atl. 588, 591.

The Pennsylvania court, in *Litcher* v. *North City Trust Co.*, has held that in Pennsylvania *defenses,* as used in section 58, N. I. L. (56 P. S. section 138), does include set-offs. But the opinion in this case does not bear internal evidence of a very careful consideration of the subject, and is far less convincing in its reasoning than is *Lincoln* v. *Grant*. The court seems to have entirely overlooked the fact that the N. I. L. is a codification of the Law Merchant, and that words used therein are to be construed as having the same meaning that they have when used in the Law Merchant, unless there is something in the N. I. L. to show that they are used with a different meaning. Further, the cases cited by the court to sustain its reasoning and conclusion do not seem to us to do so.

*Lincoln* v. *Grant, supra,* decided by the United States Court of Appeals for the District of Columbia, is a carefully considered opinion. While it is not expressly so stated in the opinion, the fair inference is that some of the set-offs in question arose before and some after the transfer of the note sued on, which had been negotiated by the payee after its maturity. The court held that *"defenses,"* as used in section 58, N. I. L. (D. C. Code, 1901, section 1362 [D. C. Code 1929, T. 22, section 78]), refers only to defenses affecting the instrument and does not include set-offs; that a negotiable instrument does not become a non-negotiable instrument when it becomes past due; and that an indorsee after maturity of a negotiable note does not take it subject to a set-off of the maker against the payee under section 1363 (section 58, Negotiable Instruments Law [D. C. Code 1929, T. 22, section 79]), and section 1566, D. C. Code 1901 [D. C. Code 1929, T. 24, section 414]. Section 1566, which is very similar to section 5678, Code Va. 1919, provides: "In an action by the assignee of any *non-negotiable* debt, the defendant may set off any indebtedness to him of

the assignor, existing before notice of the assignment." (Italics ours.)

Section 2660, Rev. Gen. St. Fla. (Comp. Gen. Laws Fla. 1927, section 4326), provides: "All debts or demands mutually existing between the parties at the commencement of the action, whether the same be liquidated or not, shall be proper subjects of set-off, and may be pleaded accordingly." In *Worden* v. *Gillett, supra*, the district court for the Southern District of Florida held under this section that a non-negotiable instrument in the hands of an assignee is not subject to a set-off against his assignor; and that section 4731 [Comp. Gen. Laws Fla. 1927, section 6818], section 58, N. I. L., does not operate to enlarge the scope of section 2660 [section 4326] saying: "Under an unbroken line of decisions, in so far as I am informed, it has been held that the right of set-off of an independent claim is neither a defense nor an equity, and was unknown at common law. * * * This does not enlarge the scope of the statute of set-off, which is not a defense."

In *Pusey & Jones Co.* v. *Hanssen* (C. C. A. 1922) 279 Fed. 488, the court had under consideration a case arising in Delaware, in which the Negotiable Instruments Law had become effective in 1912. The court held without citing or referring to what is section 58, N. I. L., that a set-off was not an equity subject to which a post-maturity transferee takes a negotiable instrument.

Each of the cases cited in the four paragraphs which follow was decided after the enactment of the Negotiable Instruments Law in the state in which the case arose; and in each of them it was held that a post-maturity transferee of a negotiable instrument took it subject to a set-off existing against the payee at the time of the transfer. But in each instance there was a statute, which had been in existence prior to the enactment of the N. I. L., that either in terms or by very plain implication so provided; and none of them can be construed as deciding that "defenses" as used in section 58, N. I. L., includes within its meaning set-offs.

In the following cases the court so held without making any reference to section 58, N. I. L., or the corresponding section of the local statute: *Chaleff* v. *Reynolds* (1919, N. Y. Sup.) 173 N. Y. S. 666; *Corrigan* v. *Harris* (1917) 207 Ill. App. 291; *Gould* v. *Svendsgaard*, 141 Minn. 437, 170 N. W. 595, noted in 19 Columb. L. Rev. 157; *McKay* v. *Hall & Co.* (1912) 30 Okla. 773, 120 Pac. 1108, 39 L. R. A. (N. S.) 658; *Little* v. *Sturgis* (1905) 127 Iowa 298, 103 N. W. 205.

In *Curlee* v. *Ruland* (1916) 56 Okl. 329, 155 Pac. 1182, and *Hanson* v. *Roesch* (1918) 104 Wash. 257, 176 Pac. 349, the so-called set-offs which were involved had in fact become payments before the time of the transfer. But the court treating them as set-offs held, without referring to section 58, N. I. L., that by virtue of the local statute of set-offs a post-maturity transferee of a negotiable instrument takes it subject to set-offs against the payee existing at the time of the transfer.

In *Emerson-Brantingham Co.* v. *Brennan* (1916) 35 N. D. 95, 159 N. W. 710, the court held that a post-maturity holder took a negotiable note subject to a set-off against the payee. In the opinion it refers to section 58, N. I. L., but it is impossible to tell from the opinion what construction it placed upon it.

In *First National Bank of Rocky Ford* v. *Lewis* (1914) 57 Colo. 124, 130, 139 Pac. 1102, it was held that under the local statutes of set-off, a set-off against a post-maturity transferor of a negotiable instrument is available against his transferee; but the court expressly left it an open question as to whether a set-off against a prior party was a *defense* within the meaning of section 58, N. I. L.

The Negotiable Instruments Law was enacted in Massachusetts in 1899. In *Cosmopolitan Trust Co.* v. *Leonard Watch Co.*, 249 Mass. 14, 143 N. E. 827, without citing or referring to section 58, N. I. L., the court held that, when the commercial department of a trust company transferred a note *without indorsement* to the savings department the latter was not a holder in due course and took it subject

to the maker's rights against the commercial department at the time of the transfer, but held it *not* subject to a set-off against the commercial department arising after the transfer, but before the maker received notice of the transfer. While section 58, N. I. L., was not cited or referred to by the court, this decision cannot be sustained if *defenses* as used in that section means *technical defenses and set-offs,* because had the note been non-negotiable it would have been subject under the local statute of set-offs to any set-off acquired by the maker before he received notice of the transfer.

In *Clark* v. *Wheeler, supra,* it was held: "Payment by the maker of a note prior to its transfer is a good defense to an action against him by an indorsee, who took it after it became due, although he paid full consideration for it and had no notice of the payment.[16] *Whittaker* v. *Ordway,* 69 N. H. 182, 38 Atl. 789. But payment to the original payee after transfer and delivery of the note is no defense against the transferee, although he acquired the note after maturity." With reference to the last point, after quoting section 58, N. I. L., the court says:

"This section does not impair the negotiability of an overdue note, it assumes the continued existence of its negotiable character. * * * The fact that the paper is negotiable is relied upon in *Leavitt* v. *Peabody, supra,* holding that, in an action of an indorsee in good faith for value of an overdue promissory note, the maker cannot set-off debts due him from the payee. The defendants claim this decision is overturned by the statute (section 58, N. I. L.). No decisions construing this section have been called to our attention.

---

[16] In the following cases decided after the enactment of the Negotiable Instruments Law, it was held without referring to section 58, N. I. L., that a post-maturity transferee of a negotiable instrument took it subject to a payment made to the payee before it was transferred to him. But as has been seen, this would have been true under the Law Merchant in the absence of any statute of set-offs or the provisions of section 58, N. I. L. *Carrington* v. *Turner* (1905) 101 Md. 437, 61 Atl. 324; *Hagin* v. *Shoaf* (1913) 9 Ala. App. 300, 63 So. 764; *Rosinoff* v. *Altshul,* 99 N. J. L. 519, 123 Atl. 376.

"Section 51 of the Negotiable Instruments Act provides that payment to a holder in due course discharges the instrument. No suggestion is found in the act that payment to any other than the legal holder will discharge it. In the absence of such provisions, the act does not appear to conflict with the decisions *supra* as to the invalidity of payments to the original holder after assignment."

When we consider the origin, history and purposes of the Negotiable Instruments Law it cannot logically be held that *defenses* as used in section 58 thereof was intended to have one meaning in one state and a different meaning in another. That is, that it should mean technical defenses *and offsets* in one state, and technical defenses, *but not offsets,* in another.

Upon an examination of the statutes of the several states existing at the time the Negotiable Instruments Law was drafted, it will be seen that if section 58 be construed to apply to technical defenses, and to leave negotiable instruments negotiated after maturity subject to set-offs against prior parties or not as the local statutes may provide, the effect would be to leave the law on the subject just where it was under the Law Merchant, as modified by the local statutes of set-off. The purpose of the Negotiable Instruments Law was to codify and make certain and uniform the rules of the Law Merchant, and this meaning accords with that purpose. On the other hand, to define *defenses* as including set-offs injects into the Negotiable Instruments Law a rule of law which is foreign to the genius of the Law Merchant. Further, if *defenses* as used in section 58, N. I. L., be given the meaning of technical defenses *and set-offs,* it would have the effect of repealing the statutes of set-off of a number of states which for many years had expressly provided that a negotiable instrument transferred after maturity shall not be subject to set-offs acquired against the transferor after the transfer.

Also in a number of states it would make a negotiable instrument negotiated after its maturity subject to set-offs acquired against the transferor either before or after the

transfer, though neither class of set-offs had ever been allowed in those states. Indeed, defining *defenses* as used in section 58, N. I. L., as including both technical defenses and set-offs would have resulted in a wholesale change in the law on the subject in a large part of the United States. The draftsmen of the Negotiable Instruments Law made it plain in their note in section 58, we think, that this was not the purpose of that section.

When these things are taken into consideration, we are of the opinion that the word *defenses* is used in section 58, N. I. L. (section 5620, Code Va. 1919), in the same sense that it is used in the Law Merchant. That is, it means technical *defenses* and does not embrace within its meaning mere set-offs. We are further of the opinion that the enactment of section 58, N. I. L., making a negotiable instrument in the hands of a post-maturity transferee subject to the same defenses (as distinguished from set-offs) as if it were non-negotiable, did not operate to repeal by implication an existing statute which expressly or by implication made a negotiable instrument negotiated after its maturity subject to either all or some of the set-offs which would be good against the instrument in the hands of his transferor. The maxim *expressio unius est exclusio alterius* has no application to the construction of this section.

Our final conclusion upon this subject is: Under the law as it stands in Virginia, a post-maturity transferee of a negotiable note, who is a *bona fide* purchaser for value thereof from the payee, takes the instrument free and clear of any mere set-off which the maker has against the payee at the time of the transfer, and, of course, free of any that the maker may thereafter acquire.

It follows from what has been said that the court did not err in refusing to allow the set-off pleaded in special pleas numbered 1, 2 and 3, and that it did err in allowing the set-off pleaded in special plea No. 4.

It may well be that the correct public policy is reflected in the statutes of New York, Illinois and Michigan, and that some similar statute should be enacted in Virginia. But this

is a matter for determination by the General Assembly and not by the courts.

The judgment of the trial court will be modified by striking out the provision thereof allowing the credit of $115.95, and as so modified will be affirmed; and costs in this court will be awarded to the defendant in error, Union Bank and Federal Trust Co.

*Judgment modified, and, as modified, affirmed.*